## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHARLES P. TALLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  3:07-cv-00829** |
| | ) | **Judge Trauger** |
| **DANNY CROSBY, in his official capacity,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the motion for summary judgment filed by the defendant (Docket No. 32), to which the plaintiff has responded (Docket No. 42), and the defendant has replied (Docket No. 45).  For the reasons discussed herein, the defendant's motion will be granted.

## BACKGROUND

The plaintiff, Charles P. Talley, brings this suit against the defendant, Danny Crosby, in his official capacity as Mayor of the Town of Coopertown, Tennessee (the "Town").  Mr. Talley was employed by the Town as a member of the police force at all relevant times from November 2004 until his resignation on November 29, 2005.[1]

---

[1]Unless otherwise noted, the facts are drawn from the plaintiff's response to the defendant's statement of undisputed facts and the exhibits, depositions, and affidavits submitted by the parties in support of and opposition to the defendant's summary judgment motion. (Docket Nos. 36, 42-44.)

1

In November 2004, after he took office, Mr. Crosby re-hired Mr. Talley, who had previously accepted a lay-off from Mr. Crosby's predecessor in the mayor's office. At the time of his re-hire, Mr. Talley was forty-one years of age. Shortly after his re-hire, Mr. Talley was assigned to the night shift, which required him to work from 10:00 or 11:00 p.m. until 6:00 or 7:00 a.m. the following morning. He continued to work that shift until his resignation. Mr. Crosby promoted Mr. Talley from the rank of patrol officer to sergeant in March 2005. Subsequently, E.J. Bernard became the chief of police and demoted Mr. Talley back to the rank of patrol officer. Mr. Bernard testified that he demoted Mr. Talley because he believed that Mr. Talley did not have sufficient supervisory skills.

In November 2005, the police department received a complaint from a citizen, Jessika Lyn Ross, about Mr. Talley's conduct. Specifically, Ms. Ross complained that, after obtaining her telephone number from a ticket that he had issued to her, Mr. Talley contacted her repeatedly to ask her out on a date. She further complained that, on one occasion, Mr. Talley went to the nightclub where she worked; Mr. Talley was obviously intoxicated and was "very touchy feely and wouldn't stop." Ms. Ross learned that, after she left the nightclub that evening, Mr. Talley was thrown out for "being drunk and touching girls."

In response to Ms. Ross's complaint, Mr. Bernard asked Sergeant Rodney Porter to interview Mr. Talley. During the course of that interview, Mr. Porter advised Mr. Talley that the Town's "options" were to terminate or to suspend Mr. Talley. Mr. Porter requested that Mr. Talley prepare a written account of the incident about which Ms. Ross had complained. Mr. Talley did not prepare a written statement as requested and was placed on administrative leave.

Meanwhile, Mr. Talley consulted with an attorney, who advised him not to permit the Town to terminate him with "anything like that" on his record, the implication being that Mr. Talley would have difficulty obtaining employment in the future if he was terminated as a result of some type of sexual misconduct. Mr. Talley resigned his position on November 25, 2005.

At the time of his resignation, to Mr. Talley's knowledge, his age was not an issue. Following his resignation, Mr. Talley participated in an ouster proceeding against Mr. Crosby. In the course of that proceeding, Mr. Talley learned from two individuals, Jonathan Coulon and Susan Slawson, that they each had heard Mr. Crosby make statements with respect to Mr. Talley's age, his weight, and his ability to do his job.

## ANALYSIS

The plaintiff asserts claims of age discrimination and a hostile work environment in violation of the Age Discrimination in Employment Act ("ADEA"). The defendant moves for summary judgment with respect to those claims.

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

3

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

4

## II.    Age Discrimination

The ADEA provides that it is unlawful for an employer to discriminate against any individual with respect to compensation or the terms, conditions, or privileges of employment on account of the individual's age.  29 U.S.C. § 623(a)(1).  An age discrimination claim under the ADEA may be established either through direct evidence of discrimination or through circumstantial evidence of such discrimination.  *Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Kline v. Tenn. Valley Auth.*, 127 F.3d 337, 348 (6th Cir. 1997)).  Direct evidence is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  Circumstantial evidence is evidence that "does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  *Wexler*, 317 F.3d at 570 (citing *Kline*, 127 F.3d at 348).

In this case, the plaintiff asserts that his discrimination claim is established both by reliance on direct evidence and by reliance on circumstantial evidence.

### A.    Direct evidence

In age discrimination cases, statements that are alleged to provide direct evidence of discrimination are evaluated by reference to four factors: "(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of terminations."  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir.

5

2002). None of these factors is controlling but, rather, they must be evaluated as a whole. *Id.* at 478.

Here, Mr. Talley alleges that certain statements made by Mr. Crosby constitute direct evidence of discrimination. Specifically, Ms. Slawson testified that, in March or April of 2005, she overheard Mr. Crosby say "that he was really concerned, because [Mr. Talley] was old, very overweight and that he didn't feel that [Mr. Talley] could respond and do a call according to the statutes of the law." (Docket No. 42 Ex. 3 at 6-7.) Additionally, Mr. Coulon testified that, in May or June of 2005, Mr. Crosby made a comment to him to the effect that Mr. Talley was "too old and too fat for the job," "that if he had to get out there and chase somebody, he wouldn't be able to chase them," and "that he needed to go ahead and retire." (Docket No. 42 Ex. 4 at 16.) Mr. Coulon further testified that Mr. Crosby called Mr. Talley "old and gray haired."[2] (*Id.* at 10.) In addition to these comments, Mr. Bernard testified that Mr. Crosby "wanted [Mr. Talley] fired" because Mr. Talley was "too fat and too old." (Docket No. 42 Ex. 1 at 146.)

These statements do not, however, establish direct evidence of discrimination. Although they were, indeed, made by Mr. Crosby, who ultimately had decision-making authority, there is no evidence of any nexus between the statements and the decisional process. The statements about which Ms. Slawson and Mr. Coulon testified occurred many months prior to Mr. Talley's termination. Additionally, although Mr. Bernard believed that Mr. Crosby wanted Mr. Talley

---

[2]Mr. Coulon also testified that Mr. Crosby placed a package of diet pills in Mr. Talley's box and told Mr. Talley that he needed to lose weight (Docket No. 42 Ex. 4 at 8) and that Mr. Crosby took one of the department's new vehicles away from Mr. Talley, instead requiring him to drive "one of the oldest and raggediest cars" because he believed Mr. Talley was "tearing the car up." (*Id.* at 9.) Likewise, Ms. Slawson testified that Mr. Crosby complained that Mr. Talley "was constantly tearing up car seats" as a result of his weight. (Docket No. 42 Ex. 3 at 7.) There is no indication, however, that any of these incidents or statements had anything to do with Mr. Talley's age and, therefore, they do not constitute direct evidence of age discrimination.

fired, he testified that, in the end, age had nothing to do with the process that culminated in Mr. Talley's resignation. (Docket No. 42 Ex. 1 at 147.) In sum, these remarks constituted nothing more than isolated remarks that are not evidence of a discriminatory animus. *See Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 550 (6th Cir. 2004) ("[S]tatements by decision makers unrelated to the decisional process itself [cannot] satisfy the plaintiff's burden of demonstrating animus." (quotation and citation omitted)); *Rosso v. A. I. Root Co.*, 97 Fed. Appx. 517, 520 (6th Cir. 2004) (holding that isolated and ambiguous comments made six months prior to termination do not constitute direct evidence of discrimination).

> B.    *Circumstantial evidence*

In addition to relying on direct evidence, Mr. Talley also asserts that circumstantial evidence supports his age discrimination claim. Where a plaintiff relies on circumstantial evidence of discrimination, the claim is analyzed according to the familiar *McDonnell Douglas* framework. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (applying *McDonnell Douglas* in ADEA case); *Johnston v. O'Neill*, 130 Fed. Appx. 1, 7 (6th Cir. 2005) (same). Under that framework, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff carries that burden, the defendant must present a legitimate, non-discriminatory reason for its actions. *Id.* at 802-03. If the defendant does so, the plaintiff must show that the reason proffered by the defendant is merely a pretext for discrimination. *Id.* at 804.

To establish a *prima facie* case of age discrimination, a plaintiff must demonstrate: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) after he was rejected, a substantially younger applicant was selected." *Burzynski v. Cohen*, 264 F.3d 611, 622

7

(6th Cir. 2001) (citing *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 341 (6th Cir. 1998)). Here, the defendant argues that Mr. Talley has not established that he was subjected to an adverse employment action. (Docket No. 34 at 7-12.)

An adverse employment action is defined as a "materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (quoting *Ford*, 305 F.3d at 553).

An adverse employment action may also be established where an employee is constructively discharged, which is to say, where an individual's working conditions are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Smith v. Henderson*, 376 F.3d 529, 533-34 (6th Cir. 2004) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). To establish a constructive discharge, a plaintiff must demonstrate (1) that the employer "deliberately created intolerable working conditions, as perceived by a reasonable person"; and (2) that the employer "did so with the intention of forcing the employee to quit." *Logan v. Denny's*, 259 F.3d 558, 568-69 (6th Cir. 2001) (quoting *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). A number of factors are relevant in determining whether a reasonable person would have felt compelled to resign, including "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor;

8

(6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Id.* at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

Mr. Talley asserts that the defendant accused him of improper conduct and essentially forced him to resign, lest he be terminated, and that his resignation therefore amounted to a constructive discharge. (Docket No. 42 at 7-10.) This assertion, however, does not accord with the evidence. First, the allegations of improper conduct originated with Ms. Ross, not with the defendant. (Docket No. 36 Ex. 1, Exs. 1 & 2; Docket No. 36 Ex. 4 at 13.) Although Mr. Talley implies that the accusations against him were trumped up, there is no evidence of this whatsoever and, in fact, Mr. Talley confirmed most of the details of the incident about which Ms. Ross complained. (Docket No. 36 Ex. 1, Ex. 3; Docket No. 36 Ex. 2 at 53.)

Moreover, Mr. Porter testified that, in the course of investigating Ms. Ross's complaint, he informed Mr. Talley that the Town was considering two options: termination or suspension.[3] (Docket No. 36 Ex. 4 at 15.) At the time of the investigation, however, the Town had not yet determined whether Mr. Talley would be terminated or suspended. (Docket No. 36 Ex. 3 at 150; Docket No. 36 Ex. 4 at 23.) Mr. Talley was asked to prepare a written statement regarding the incident and was informed that, if he did not, he would be placed on administrative leave.

---

[3]Mr. Porter tape recorded his conversation with Mr. Talley. Both Mr. Porter and Mr. Talley were asked about that recording during their depositions (Docket No. 36 Ex. 4 at 16; Docket No. 36 Ex. 2 at 62), and the defendant submitted a copy of the recording in support of his motion (Docket No. 35). Mr. Talley now challenges the authenticity and the audio quality of that recording. (Docket No. 42 at 13-14.) Although skeptical that there is any merit to this argument, the court finds that reliance on the recording is unnecessary, as the deposition testimony provides a sufficient and largely undisputed description of the conversation between Mr. Porter and Mr. Talley.

9

(Docket No. 36 Ex. 1, Ex. 3; Docket No. 36 Ex. 4 at 27.)  Mr. Talley refused to provide that statement.  (Docket No. 36 Ex. 4 at 27.)

This is wholly consistent with Mr. Talley's testimony regarding Mr. Porter's investigation.  Mr. Talley acknowledged that he was informed that the Town's options were to terminate him or to suspend him.  (Docket No. 36 Ex. 2 at 63.)  Although he testified that he "felt" that he was being forced to resign (Docket No. 36 Ex. 2 at 63, 68, 80), he admitted that no one ever told him he would be terminated and that, in fact, he did not know whether he would be terminated as a result of the investigation (Docket No. 36 Ex. 2 at 63).  He also acknowledged that he refused to provide a written statement, as Mr. Porter had requested.  (Docket No. 36 Ex. 2 at 62.)  Further, Mr. Talley testified that he had no reason to believe that age was a consideration in the investigation.  (Docket No. 36 Ex. 2 at 42, 73-74.)

According to Mr. Talley, following his meeting with Mr. Porter, he consulted an attorney who advised him not to "let them fire you with anything like that on your record."  (Docket No. 36 Ex. 2 at 64.)  An attorney subsequently contacted Mr. Bernard on Mr. Talley's behalf and first raised the question of resignation, asking Mr. Bernard whether Mr. Talley might "be permitted to resign."  (Docket No. 36 Ex. 3 at 146, 150.)  Mr. Talley testified that his subsequent resignation was motivated by his concern that he would not be able to find another job if he were terminated on the basis of Ms. Ross's complaint and that he felt resignation was in his best interest.  (Docket No. 36 Ex. 2 at 68-69, 72.)

What the evidence unequivocally demonstrates, contrary to Mr. Talley's claim, is that Mr. Talley chose to resign rather than to permit the Town to complete its investigation of Ms. Ross's complaint, for fear of the outcome of that investigation.  This case bears a notable similarity to the case of *Driggers v. City of Owensboro, Ky.*, 110 Fed. Appx. 499 (6th Cir. 2004).

10

In that case, the plaintiff police officer was under investigation by the police department and was informed that she likely would be disciplined or terminated if she did not resign. *Id.* at 506-07. The court rejected her claim of constructive discharge, noting that "[i]t does not follow . . . that [her] only alternative at that point was to resign," because "it was speculative for her to conclude that the inevitable result of disciplinary charges . . . would be her termination." *Id.* at 507. The court found that the plaintiff's resignation was voluntary in light of the fact that she had the option of challenging the charges against her and that, therefore, a reasonable jury could not conclude that she had no alternative but to resign. *Id.* Here, as in *Driggers*, Mr. Talley was informed that suspension or termination were possible outcomes of Mr. Porter's investigation and was encouraged to provide a written statement explaining his position. He also admitted that he did not know what the result of the investigation would be. However, rather than providing a statement and permitting the investigative process to move forward, Mr. Talley instead chose to resign. Moreover, he admitted that he was motivated to resign after consulting with an attorney and deciding that it was in his best interest to resign rather than to risk termination. These facts, like those in *Driggers*, defeat Mr. Talley's claim that he was forced to resign as a result of intolerable working conditions foisted upon him by the defendant.

Although Mr. Talley additionally relies on certain other incidents as evidence of the defendant's efforts to force him to resign, those incidents likewise do not provide support for his claim. Specifically, Mr. Talley complains about his assignment to the night shift, his demotion to patrol officer, and the fact that he was assigned one of the department's older vehicles. Mr. Talley himself admits, however, that there is no evidence that those actions were taken in the hopes of inducing him to resign. (Docket No. 36 Ex. 2 at 80.) Moreover, those incidents occurred, in some cases, many months prior to Mr. Talley's resignation in November 2005

11

(Docket No. 36 Ex. 2 at 48-50), reflecting that Mr. Talley was not compelled to resign as a result of those minor slights, nor that any reasonable person would be so compelled. Finally, although Mr. Talley complains about certain comments that Mr. Crosby made regarding his age, he testified that he did not personally hear Mr. Crosby make any references to his age during his tenure, but only learned of such comments from Ms. Slawson and Mr. Coulon in the context of the ouster proceeding, months after his resignation. (Docket No. 36 Ex. 2 at 37, 73-74.) Such comments, therefore, cannot have contributed to the intolerable working conditions that Mr. Talley claims to have experienced.

Finally, the court briefly addresses the "same actor inference" recognized in the Sixth Circuit, which "allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Wexler*, 317 F.3d at 572 (citing *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995)). The inference is not mandatory and, alone, is insufficient to warrant summary judgment where there otherwise exists a genuine issue of material fact. *Id.* at 573-74. Here, however, no genuine issue of fact otherwise exists, and therefore the fact that Mr. Crosby both re-hired Mr. Talley and promoted him to sergeant shortly after his re-hire just serves to strengthen the conclusion that Mr. Talley's age discrimination claim cannot survive summary judgment.

## III.     Hostile Work Environment

Finally, the court turns to Mr. Talley's hostile work environment claim. To state a *prima facie* case that he suffered a hostile work environment in violation of the ADEA, Mr. Talley must demonstrate that (1) he is forty years of age or older; (2) he was subject to harassment on the basis of age; (3) the harassment unreasonably interfered with his work performance and created an objectively intimidating, hostile, or offensive work environment; and (4) there is a

12

basis for holding the employer liable.  *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996).  For harassment to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment."  *Id.* at 835 (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 47, 67 (1986)).  The standard is both subjective and objective; not only must a plaintiff subjectively experience the environment as hostile, but it must be hostile in an objective sense as well.  *See id.*  The court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Mr. Talley's hostile work environment claim is premised on his demotion to patrol officer, his assignment to the night shift, his assignment to an older vehicle, and the allegedly false complaint against him that he claims Ms. Ross was "encouraged" to make.[4]  (Docket No. 42 at 12.)  These allegations may be disposed of in short order.  First, as discussed above, there is zero evidence that Ms. Ross's complaint was false or that she was encouraged to make that complaint by the defendant or anyone acting at the defendant's behest, and thus no evidence that the complaint constituted harassment, let alone harassment on the basis of age.  Second, Mr. Talley himself acknowledged that he had no notion that age was an "issue" at the time of his resignation (Docket No. 36 Ex. 2 at 42) nor that his demotion or car assignment had anything to do with age (Docket No. 36 Ex. 2 at 49, 52).  Indeed, there no evidence that any of these

---

[4]The defendant asserts that a number of these incidents occurred outside the actionable time period and thus may not be considered in support of Mr. Talley's hostile work environment claim.  (Docket No. 34 at 18-19.)  The court need not address this argument, however, as the defendant would be entitled to summary judgment regardless of when these incidents took place.

13

incidents had anything whatsoever to do with Mr. Talley's age. Finally, there is no evidence that these incidents were so severe or pervasive as to interfere with Mr. Talley's work performance or create an intimidating, hostile, or offensive work environment.

As there is no genuine issue of fact with respect to two of the elements necessary to sustain a hostile work environment claim, summary judgment will be granted for the defendant.

## **CONCLUSION**

For the reasons discussed herein, the defendant's motion for summary judgment will be granted and the plaintiff's claims dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

14